[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11105
_____

D.C. Docket No. 1:11-cv-23948-FAM


ALEXANDRA H.,

                                                        Plaintiff - Appellant,

versus

OXFORD HEALTH INSURANCE, INC.,

                                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 8, 2019)

Before WILSON, JILL PRYOR, and SUTTON,[*] Circuit Judges.

SUTTON, Circuit Judge:

Alexandra H. struggled with anorexia and undertook several types of treatment for it. After she underwent a few weeks of "partial hospitalization" at a specialized treatment facility in Miami, Oxford Health Insurance, the administrator of her ERISA benefits plan, decided that this level of care was no longer medically necessary and denied coverage for that level of treatment. Three administrative reviewers upheld that decision. So eventually did the district court, which granted summary judgment to Oxford. We affirm.

I.

Alexandra teaches elementary school in Brooklyn and is in her late thirties. Since middle school, she has suffered from anorexia. She has been hospitalized frequently and has tried many different types of treatments.

On December 14, 2010, she entered a "partial hospitalization" program at Oliver-Pyatt, a Miami treatment center that specializes in eating disorders. The center treated her for anorexia, obsessive compulsive disorder, and major depressive disorder. She had 12 hours of therapy each weekday, spending evenings and weekends on her own in a boarding facility.

---

[*] Honorable Jeffrey S. Sutton, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

2

After reviewing her symptoms, Oxford agreed to provide insurance coverage for a few days of partial hospitalization. The insurance company's medical director, a psychiatrist, extended benefits twice after examining her treatment file and speaking with her treating physicians. On January 4, 2011, however, the medical director found that Alexandra had improved and recommended she transition to a lower level of care, concluding that partial hospitalization was no longer "medically necessary" under the employee benefits plan. Oxford denied additional benefits for partial hospitalization at that point.

Alexandra challenged the decision, first proceeding through two levels of internal appeal. Both of the reviewers, psychiatrists not previously familiar with her case, upheld Oxford's medical-necessity determination. Alexandra sought an external appeal under New York law through the State of New York. The State's assigned independent reviewer, also a psychiatrist, agreed that partial hospitalization was not medically necessary.

In 2011, Alexandra filed this ERISA action in the United States District Court for the Southern District of Florida. The court determined that the benefits plan's terms precluded her from challenging medical necessity after the external reviewer's decision. This court disagreed and remanded the case to permit the parties to determine whether "partial hospitalization" remained a medical necessity at the time Oxford denied coverage. 833 F.3d 1299 (11th Cir. 2016). On remand,

3

both sides moved for summary judgment.  The district court granted Oxford's motion.

## II.

We review an administrator's decision to deny benefits under an ERISA plan either with fresh eyes or for abuse of discretion depending on whether the plan grants the administrator discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The parties stake out different positions on the proper standard of review.  But that's a thicket we need not enter, as the record supports Oxford's decision under either standard.

The plan defines "medically necessary" treatments as those that (among other things) are offered at "[t]he most appropriate supply or level of services which can safely be provided."  R. 130-1 at 113.  A level of care remains medically necessary, according to the plan's level-of-care guidelines, if the patient "continues to present with symptoms and/or history that demonstrate a significant likelihood of deterioration in functioning/relapse if transitioned to a less intensive level" and if she "cannot effectively move toward recovery and be safely treated in a lower level of care."  R. 130-5 at 46–47.

Even if we review afresh the medical evidence before Oxford at the time of its decision, Alexandra has not met her burden of showing that partial hospitalization was still the most appropriate level of care on January 4, 2011.  *See*

4

*Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246–47 (11th Cir. 2008).  The plan's definition of medical necessity focuses on the stability of improvement:  Was the patient's progress substantial enough that a step down in treatment was unlikely to cause a setback?

Both considerations—stability of improvement and risk of setback—animated Oxford's decision.  For the medical director and the reviewers who upheld her decision, the benefits denial turned on two factors:  the marked improvement in Alexandra's precipitating symptoms and the absence of dangerous symptoms.  *See* R. 130-5 at 36 (noting weight gain, meal completion, and treatment compliance, and concluding that "ongoing personality-related issues . . . can continue to be addressed in [intensive outpatient care]"); *id.* at 36–37 (noting "improvements in the initial precipitating symptoms," that "there no longer appear to be such significant impairments," and that "treatment could continue in a less restrictive setting"); *id.* at 37 (noting "no serious risk of harm to self" or "psychosis" and "the patient could safely be treated at a lower level of care"); *see also* R. 130-3 at 32 (noting "psychiatric disturbances had improved and [she] did not exhibit severe symptoms," and concluding her "condition could be safely and effectively managed at a lower level-of-care").  Because this evidence shows that Alexandra could safely transition to less intensive care, it was fair to conclude that partial hospitalization was no longer "most appropriate."

Confirming this conclusion is a look back, a comparative assessment of her treatment status at the start of her partial hospitalization, in the middle of it, and at the end of it. When Alexandra arrived at Oliver-Pyatt on December 14, she was unable to gain weight, she was binging and restricting food, she was depressed, and she reported passive suicidal ideation without intent or plan. A week later, on December 20, she had gained a pound but was eating just fifty to seventy-five percent of her meal plan. She struggled to engage in the program and refused to see the psychiatrist. She was "very defeated," "extremely tearful," and "very isolative." R. 130-5 at 35. Although her treatment team's notes from that week indicated no suicidal ideation, Oxford's medical director noted "some" after speaking with Alexandra's treating physician. *Id.* Seeing no improvement to speak of, Oxford extended benefits for another week.

On December 27, Alexandra was "having difficulty" finishing her meals, and she would restrict her food if left to herself. *Id.* She now cooperated with treatment but was still depressed and guarded. Once again, the most recent treatment notes said nothing about suicidal ideation, but Oxford's medical director reported that according to a therapist Alexandra still experienced some ideation. Alexandra thus had improved from the previous week but not enough to make a change in the intensity of treatment. Oxford extended benefits again.

By the time Oxford denied benefits on January 4, Alexandra had turned a corner. She had gained three pounds. According to her treating physician, she still engaged in unusual eating rituals but, in the preceding week, had finished all of her meal plan—even though the treatment team had increased the amount of food and she had doubled her caloric intake over the last two weeks. She did not want medication but otherwise complied with treatment. She was depressed but "stable," "alert," "engaged," and "not disconnecting" from treatment. *Id.* at 36. She was reaching out to others in her therapy group. She had been able to care for herself over the weekend, though she reported some depressive episodes. For the first time, no suicidal ideation was noted.

When Oxford denied benefits, Alexandra had no symptoms indicating "a significant likelihood of deterioration . . . if transitioned to a less intensive level of care." *Id.* at 46–47. She instead had improved on each front. Neither was there any indication that she could not "effectively" and "safely" continue to recover following a treatment step-down. *Id.* at 47. She was eating consistently and improving emotionally even while looking after herself every evening and weekend. Under the plan's definition of "medically necessary," Oxford could deny benefits for continued partial hospitalization and recommend a transition to intensive outpatient care and the fewer hours of therapy per day that came with it.

Alexandra tries to counter this conclusion on several grounds. Relying on a January 17, 2011, letter her doctors submitted in her second internal appeal, she contends that Oxford's assessment of her improvement was too rosy. In that letter, her doctors insisted that she faced a grim regression if transitioned to outpatient care, as she was "sporadically" failing to complete meals and still severely depressed. R. 130-3 at 69. Setting aside the fact that the treatment records from the week preceding Oxford's decision seem to indicate she was completing all of her meals, the point isn't whether Alexandra was a picture of health. Neither is it whether she was ready to stop treatment altogether. It is whether she had *improved so little* that she continued to need the same kind of care as she had received for three weeks or instead could handle a step down in treatment. In that same letter, to that point, her doctors acknowledge her "marked progress," noting that she was exploring better responses to her disorder's psychological triggers and was more accepting of her nutritional needs and the difference between weight gain and real recovery. *Id.* at 70.

Alexandra adds that she still experienced suicidal ideation at the time of Oxford's decision. But that concern is not reflected in the doctors' records. Oxford's medical director noted suicidal ideation both times she extended benefits, but there were no such reports the day Oxford denied benefits. No less importantly, suicidal ideation, even had it still existed, would not automatically

8

demand full-time treatment.  Keep in mind what "passive suicidal ideation without intent or plan" means:  It refers to a situation in which the patient may think about or wish for death but harbors no intent or plan to harm herself.  Alexandra came to Oliver-Pyatt with suicidal ideation and was nonetheless deemed a good fit for partial hospitalization—a day-treatment program that leaves patients to their own devices for half of every day and a program that all parties agree was appropriate for her at the time.  All of this confirms the essential distinction between having suicidal ideation and intending or planning to commit suicide, the latter of which would make a patient ineligible for *either* program and require more intensive care.

Alexandra notes last of all that she had tried outpatient treatment before and it always failed.  In support, she relies on her doctors' letter, which emphasizes that a history of premature treatment step-downs contributed to the chronic nature of her illness.  While Oxford's guidelines treat a patient's history as relevant to the medical-necessity determination, an unsuccessful history is not dispositive or for that matter very probative here.  The fact that past step-downs were premature proves nothing about this one, particularly given the doctors' acknowledgement that Alexandra had "greater conviction about her need to recover" this time and that the care she received was strategically different from her prior treatments.  R. 130-3 at 73.  Plus, the guidelines mention a patient's *current* symptoms in the same

9

breath as her history.  Alexandra's earlier defeats did not establish her destiny for this medical transition or any other.

**AFFIRMED.**